**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-CR-0206-CVE |
| ) | |
| LEVI MCCRAE LUGINBYHL, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Before the Court is Defendant's Motion to Suppress (Dkt. # 48). Defendant Levi McCrae Luginbyhl ("Luginbyhl") is charged in the Indictment (Dkt. # 2) with possession of a firearm and ammunition after former felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) [Count One]; and knowingly possessing a shotgun having a barrel of less than 18 inches in length in violation of 26 U.S.C. §§ 5841, 5845(a)(1), 5861(d), and 5871 [Count Two]. He seeks to suppress evidence obtained on November 15, 2006. The Court held a suppression hearing on August 6, 2007. Tulsa Police Officer Steve Williams ("Williams") and defendant testified at that hearing. The Court admitted and reviewed evidence from both plaintiff and defendant. For the reasons set forth below, the Court finds that the motion to suppress should be denied.

**I.**

At 1:47 p.m. on November 15, 2006, a female placed a call from a house located at 8617 East 17th Street in Tulsa, Oklahoma. Upon receiving the call, the complaint-taker[1] identified herself as "Tulsa Police Department." Dkt. # 48-2, at 1; Dkt. # 54-2, at 1. The female caller, later known to be the daughter of Yvette Hill, informed the complaint-taker that "there's a man in the back yard of our neighbor's house and he's stealing stuff in the back of his house." Dkt. # 48-2, at 1; Dkt. # 54-2, at 1. The daughter described the man as Mexican and said, "he's going crazy." Dkt. 48-2, at 1; Dkt. # 54-2 at 1. She then passed the phone to her mother, Yvette Hill ("Hill"). Hill told the complaint-taker that the man was wearing all black and was approximately 25-30 years of age. She said, "he looks like he's on drugs or something because he is doing some weird stuff." Dkt. # 54-2, at 1; Dkt. # 48-2, at 1 (reciting a slight variation of wording).[2] Hill informed the complaint-taker that the man was in her neighbor's "stuff" and that "he is back over there doing some crazy karate[3] stuff." Dkt. # 54-2, at 11.

Hill informed the complaint-taker that the neighbor, later known to be Lewis Kerr ("Kerr"), arrived and was "confronting that man." Dkt. # 48-2, at 2; Dkt. # 54-2, at 2. Hill then directed

---

[1] At the suppression hearing, Williams clarified that complaint-takers receive calls, type information into a computer, and "text" that information to dispatchers. The complaint-takers and dispatchers are located in the same room, located next to the Tulsa Police Department in downtown Tulsa. The dispatcher monitors the "texted" information and, if necessary, contacts police officers in the field.

[2] The United States' and defendant's transcripts of the call differ slightly due to the difficulty in understanding parts of the tape. Any differences in the tape are, unless otherwise noted, irrelevant. The Court has listened to the tape and has attempted to report the conversation accurately.

[3] Defendant's transcript uses the word "dance" instead of karate. The Court listed to the tape and finds that Hill used the word "karate." Defendant admitted that he performed some martial arts maneuvers at this time.

someone to "go get the gun to shoot this man." Id. The complaint-taker warned Hill not to use a gun because it would "escalate the situation." Id. The complaint-taker asked Hill if the man had a weapon such that she needed to defend herself. Id. Hill responded, "I don't see . . . I don't see what he's got but we don't know what the man has." Id. When the complaint-taker asked Hill if the man was assaulting Kerr, Hill responded, "right now he's just talking to him." Dkt. # 48-2, at 3; Dkt. # 54-2, at 2. Hill continued, "This man looks like he is crazy or something because he is doing his hands all kind of crazy ways and . . . see he was out here doing martial arts. I guess he's on drugs or something." Id. The complaint-taker then asked Hill whether anyone had retrieved a gun. Hill responded, "nobody going . . . nobody went and get nothin'." Dkt. # 48-2, at 3; Dkt. # 54-2, at 3. Hill then informed the complaint-taker, "I guess the man told him to get out of his yard so he's leavin'." Dkt. # 48-2, at 4; Dkt. # 54-2, at 3. She said, "the owner made him leave. So he's fine, I mean, I guess." Id.

At approximately 1:49 p.m., during Hill's call to the complaint-taker, a female dispatcher notified Williams that a "suspicious subject" was in the yard behind 8617 East 17th Street.[4] Dkt. # 48-2, at 5; Dkt. # 54-2, at 4. The dispatcher also called for back-up, and Officer Don Arent ("Arent") responded to that call. The female dispatcher said that the suspect was a Hispanic male in his 30s wearing black. Id. Dispatch further explained that Hill believed the man to be "possibly on drugs in the neighbor's yard and the person who lives there is now confronting the Hispanic male." Dkt. # 54-2, at 4. The female dispatcher stated that the complaint-taker was still on the line

---

[4] Government Exhibit 7 is the Tulsa Public Safety Communication log. It sets forth the information that the complaint-taker "texted" to dispatch. The information related to Williams by dispatch via radio, as evidenced by the transcript, mirrors the information in the communication log.

with Hill. Id. ("We are still public service."). At approximately 1:53 p.m., a male dispatcher then informed the officers: "The elderly neighbor said something about getting a gun. It looks like somebody . . . our caller . . . told the neighbor not to get the gun and now it looks like the subject may be walking away." Id. At the suppression hearing, Williams testified that he (incorrectly) believed that dispatch said that the subject was getting a gun. In his police report, he wrote: "Upon arriving, this officer was advised that the subject stated he was going to get a gun and was last seen walking Northeast towards E. 16th." Dkt. # 54-2, at 11.

Williams and Arent arrived at the scene separately. Arent proceeded to the Kerr residence; Williams proceeded to East 16th Street and saw defendant, who matched the description from the dispatcher, emerging from between two homes. Williams testified that, at the time, he suspected defendant to be a burglar who had abandoned his burglary attempt at the Kerr residence and who was trolling the neighborhood for a different home. Williams testified that he is very familiar with the neighborhood in question because he grew up in the area and had patrolled the neighborhood for eight years. Williams stopped his patrol car and asked defendant to come toward the car.[5] Williams then asked defendant his name and identification.[6] Defendant made several anti-government remarks and told Williams that he did not recognize the authority of police officers. Based on

---

[5] In his motion to suppress, defendant states that the officer "immediate tackled" him when they first encountered one another. See Dkt. # 48, at 6. Williams' testimony, which the Court finds to be credible, was to the contrary. Thus, the Court finds that Williams did not tackle defendant immediately, but rather proceeded in the manner described.

[6] It is unclear whether defendant provided his name. Williams could not definitively remember defendant's response; he believes that defendant provided his name but did not provide identification. Defendant testified that he did not provide his name or identification and instead asked Williams his name. Whether defendant provided his name at this point is not critical to the Court's inquiry.

defendant's conversation with him, Williams wondered if defendant was under the influence of drugs or had a mental illness. However, Williams did not display any physical signs of intoxication; he did not stumble or slur his speech.

Williams waited until Arent arrived to conduct a pat-down search of defendant. Williams directed defendant to put his hands on his head, defendant complied, and Williams patted-down defendant's coat. On defendant's left side, Williams felt an object that he believed to be a gun or other potentially dangerous object. He raised defendant's coat and saw a firearm. Williams then swept under defendant's feet, thereby bringing defendant to the ground. He put defendant in handcuffs and placed him under arrest. Williams conducted a further search and found duct tape, handcuffs, and a stocking cap on defendant's person.

## II.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary inference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). In balancing these interests, the Supreme Court has held that arrests, being the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause. Novitsky v. City of Aurora, ___ F.3d ___ (10th Cir. 2007), 2007 WL 1935142, *6 (10th Cir. July 5, 2007); United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996). Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported

by a reasonable suspicion that the detained individual is engaged in criminal activity. Id. In addition, "officers may effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'" Novitsky, 2007 WL 1935142 at *6 (quoting King, 990 F.2d at 1560).

Here, both the United States and defendant focus on whether the seizure was a legal investigative detention; however, the Court finds that Williams was exercising his "community caretaking function" in initially detaining defendant. "[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" King, 990 F.2d at 1560 (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). In exercising this noninvestigatory function, a police officer may have occasion to seize a person for Fourth Amendment purposes in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. Id. "The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se as Terry only requires 'specific and articulable facts which . . . reasonably warrant [an] intrusion into the individual's liberty.'" Id. (quoting Terry, 392 U.S. at 21). Of course, the Fourth Amendment still applies when an officer acts in a noninvestigatory capacity because "[i]t is surely anomalous to say that the individual . . . [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." Id. (quoting Camara v. Mun. Court of City and County of San Francisco, 387 U.S. 523, 530 (1967)).

Williams received a call that defendant had walked onto someone's private property, alarmed the neighbors, might have gone to get a gun[7], and was reported to be under the influence of drugs. Based on these articulable facts, regardless of whether he suspected defendant of criminal activity, Williams was permitted – indeed, expected – to exercise his community caretaking function to ensure the safety of defendant and the members of the community. Because defendant appeared under the influence of drugs or in a psychotic episode, Williams could, consistent with the Fourth Amendment, stop defendant to check on his condition and to determine if he was a danger to himself or others. See United States v. Ridea, 949 F.2d 718, 720 (5th Cir. 1991) (officers stopped defendant for his own safety and the safety of others after observing the defendant standing in the middle of the road and possibly intoxicated), vacated on other grounds, 969 F.2d 580, 582 (5th Cir. 1992) (en banc). At a minimum, Williams was aware that neighbors were concerned by defendant's bizarre behavior; thus, Williams had an obligation to investigate the situation to ensure the safety of the members of the community. Ultimately, Williams would have been derelict in his duties if he had not stopped defendant to ensure that he was not a hazard to himself and others. Therefore, the Court finds that the encounter was a reasonable exercise of Williams' community caretaking function, regardless of any suspicion of criminal activity.

### III.

In the alternative, the Court finds that the stop was a valid investigatory stop based on Williams' reasonable suspicion that defendant was engaging in criminal activity. "A seizure by means of an investigative detention 'is constitutional only if supported by a reasonable and

---

[7] As explained in Part I, this belief was mistaken, but in good faith.

7

articulable suspicion that the person seized is engaged in criminal activity.'" Reid v. Georgia, 448 U.S. 438, 440 (1980) (per curiam). An officer who "stops" and detains a person "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. An investigative detention does not require probable cause; however, it does demand "something more than an inchoate and unparticularized suspicion or 'hunch.'" United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir.1994) (internal quotation marks omitted). When evaluating the validity of a Terry stop, "the totality of the circumstances – the whole picture – must be taken into account." United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).[8]

Here, the Court finds that Williams had reasonable, articulable suspicion of criminal activity. Dispatch provided Williams with the following particularized information: (1) a caller had reported

---

[8] Both the United States and defendant assume that the information relayed to the complaint-taker should be imputed to Williams. In United States v. Shareef, 100 F.3d 1491, 1503-05 (10th Cir. 1996), the Tenth Circuit held that a court can look to the collective knowledge of multiple officers in determining whether they behaved reasonably with regard to detention, unless the presumption of collective knowledge is rebutted. In United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997), the court held that the collective knowledge doctrine applied to an officer's corroboration of information received by radio dispatch. Thus, the information "texted" to dispatch from the complaint-taker can be imputed to Williams. The Court need not determine whether the information told to the complaint-taker (but not "texted" to the dispatcher or relayed to the officers via radio) should be imputed to Williams. As explained below, the Court finds that, based on the information "texted" to the dispatcher and the information relayed to Williams, Williams had reasonable suspicion of criminal activity.

Defendant wishes to impute the Hill's conversation to the complaint-taker to Williams to show that Williams knew that defendant walked away from the Kerr residence after speaking with Kerr. Again, imputation of knowledge is not necessary to reach this conclusion. Dispatch informed Williams that defendant was leaving the Kerr residence.

a "suspicious subject"; (2) defendant had entered someone's private property; (3) defendant was "possibly on drugs"; (4) the owner of the home (Kerr) was "confronting" defendant; (5) "the elderly neighbor said something about getting a gun." See Dkt. # 54- 2, at 4.  Further, dispatch was informed that defendant was "acting crazy." See Gov't Ex. 7.  Based on these specific facts, Williams had reason to suspect, at minimum, that defendant was intoxicated in public.[9]  The fact that public intoxication is a misdemeanor does not suggest that defendant could not have been detained pursuant to Terry.  See Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1029 (10th Cir. 1997) (supporting the existence of reasonable suspicion on the basis of police finding the defendant intoxicated and near the location of a police dispatch concerning a drunk man arguing with a woman in public); United States v. Rideau, 969 F.2d 1572, 1572 (5th Cir. 1992) (relying in part on the fact that Texas law makes public intoxication a criminal misdemeanor to support a Terry stop of the defendant).  Also, the Court finds that the fact Williams did not witness the defendant stumbling does not negate Williams' reasonable suspicion.  Such a fact would have certainly contributed to Williams' reasonable suspicion; but lack of stumbling does not suggest that Williams could not have reasonably suspected that defendant was under the influence of drugs.

In addition to suspecting that defendant was intoxicated in public, Williams testified that he personally formed the belief that defendant may have been involved in attempted burglary.  The

---

[9]   OKLA. STAT. tit. 37, § 8 reads, in pertinent part: ". . . if any person shall be drunk or intoxicated in any public or private road, or in any passenger coach, streetcar, or any public place or building, or at any public gathering, from drinking or consuming such intoxicating liquor, intoxicating substance or intoxicating compound or from inhalation of glue, paint or other intoxicating substance, . . . he shall be guilty of a misdemeanor . . . ."  To be convicted under OKLA. STAT. tit. 37, § 8, the following elements must be met: (1) the defendant must be in a state of "intoxication," which is a state in which faculties are materially impaired; and (2) the defendant must be in a public place.  See Findlay v. City of Tulsa, 561 P.2d 980 (Okla. Crim. App. 1977).

following particularized facts contributed to this belief: (1) defendant had walked onto private property; (2) defendant had alarmed the neighbors; (3) defendant had moved on after having been confronted by the owner; (4) Williams knew from experience that burglars frequently abandon a burglary attempt when they find that the owner is or returns home, and move to an uninhabited house; (5) defendant was reported to be on drugs; and (6) Williams knew from experience that drug uses are more likely to commit burglary to obtain money for their drug habit.

At the suppression hearing, defendant focused on the fact that he could have entered the Kerr property for a benign purpose (such as seeking work from Kerr). However, even though "the conduct justifying [a] stop was ambiguous and susceptible of an innocent explanation[,]" Williams could "detain the individual[] to resolve ambiguity." Illinois v. Wadlow, 528 U.S. 119, 125 (2000). The fact that defendant may not have been intoxicated at the time he was detained or may not have been attempting burglary is irrelevant to the Court's reasonable suspicion analysis. United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir. 2004) (an officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a stop); Shareef, 100 F.3d at 1505 ("A mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it."). The inquiry is not whether defendant was in fact intoxicated in public or was in fact attempting to burglarize a house, but whether Williams reasonably believed him to be engaged in criminal activity.

Defendant also makes much of the fact that Hill told the complaint-taker, "[Defendant's] going toward the sidewalk. Don't ask me. The owner made him leave. So he's fine, I mean, I guess." Dkt. # 48-2, at 4 (emphasis added). However, the fact that Hill said "he's fine" (which was not communicated to Williams) and indicated that defendant was walking away from Kerr (which

10

was communicated to Williams) does not suggest that the officers did not have reason to suspect criminal behavior. These statements do not negate defendant's bizarre behavior or the fact that he appeared to intoxicated. Ultimately, the Court finds that Williams' belief that defendant was engaged in criminal activity was reasonable.

## IV.

Regardless of whether an officer detains a defendant based on his community caretaking function or based on his reasonable suspicion of criminal activity, an officer may conduct a protective frisk of the suspect's outer clothing if he reasonably believes that the suspect might be armed and presently dangerous. Terry, at 27, 30; Harris, 313 F.3d at 1233-34. "The purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." United States v. Manjarrez, 348 F.3d 881, 886-87 (10th Cir. 2003). Because the justification of a pat-down or frisk is officer safety, the search must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. In evaluating whether the precautionary steps taken by an officer were reasonable, "the standard is objective – would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Gallegos, 114 F.3d at 1030-31 (internal quotation marks omitted); see also United States v. Rice, 483 F.3d 1079, 1082 (to conduct a pat-down search, "[t]he officer need not be certain that the individual is armed.").

Defendant incorrectly implies that Hill informed the complaint-taker that she knew that defendant was not carrying a weapon. In fact, Hill only reassured the complaint-taker that no one in her household had retrieved a weapon. Hill also stated that she did not know what defendant had.

Even if Hill did not see defendant's gun, she could not have known whether defendant had a concealed weapon on his person. Further, dispatch relayed information to Williams that a gun may have been involved in the "confrontation" between defendant and Kerr. Dispatch said: "The elderly neighbor said something about getting a gun.[10] It looks like somebody . . . our caller . . . told the neighbor not to get the gun and now it looks the subject may be walking away." Dkt. # 54-2, at 4. Williams misinterpreted dispatch to mean that defendant went to get a gun.[11] Thus, he was particularly concerned that defendant posed an immediate threat, even if he had "walked away" from Kerr.

Other factors also heightened Williams' concern regarding officer safety. Defendant informed Williams that he did not recognize the authority of the police. As a result, Williams reasonably deduced that he might become confrontational. Further, Williams believed that defendant may have been scoping the neighborhood for a burglary and thus might be armed. Finally, given defendant's erratic behavior and the report of his possibly being under the influence

---

[10] It appears that the dispatcher misinterpreted the information from the complaint-taker. Hill informed the complaint-taker that her neighbor, Kerr, was elderly. See Dkt. # 54-2, at 2. The complaint-taker "texted" to dispatch that "the nbr is elderly." Gov't Ex. 7. Hill then told the complaint-taker that she (Hill) had told someone in her household to get a gun. Dkt. # 54-2, at 2. The complaint-taker "texted" the following information to dispatch: "caller said 'get the gun'; FYI for ofcr." Gov't Ex. 7. Upon reading these texts from the complaint-taker, the dispatcher told the officers via radio that "the elderly neighbor said something about getting a gun." Dkt. # 54-2, at 4. To the extent that the dispatch meant that Kerr (i.e. Hill's elderly neighbor) made a statement about getting a gun, the dispatcher misunderstood the text from the complaint-taker.

[11] Thus, it appears that there were two distinct misunderstandings: (1) the dispatcher misunderstood the texts from the complaint-taker; and (2) Williams misunderstood the dispatcher. Given that the information was transmitted from Hill to the complaint-taker to dispatch to the officers in a short period of time, it is not surprising that some miscommunication occurred.

of a controlled substance, Williams had reason to believe that defendant would act unpredictably and unstably; this heightened his concern for officer safety. See Novitsky, __ F.3d at __ (where officers had reason to believe that Novitsky was intoxicated, the officers were confronted with "an additional layer of uncertainty" that increased their concern for officer safety); Bing v. City of Whitehall, 456 F.3d 555, 564 (6th Cir. 2006) (noting that reports regarding an individual who "appeared intoxicated, ma[de] it reasonable [for police officers] to expect he would act unstably"). The Court finds that Williams had reasonable, individualized suspicion that defendant might be armed and presently dangerous; therefore, the pat-down search was valid.

## V.

Finally, defendant suggests that the investigative detention lasted for an unreasonable amount of time. The Court disagrees. Williams estimated that the defendant was detained between five and ten minutes before the protective frisk. During this investigation, Williams asked for his name and identification. Such questions were certainly within the scope of a lawful investigative detention. See United States v. Garner, 416 F.3d 1208, 1216 (10th Cir. 2005) ("[a]n identity request has an immediate relation to the Terry stop's purpose, rational and practical demands") (citing Hiibel v. Sixth Judicial Dist. Court of Nev., Humbolty County, 542 U.S. 177 (2004)). Further, during the detention, defendant spoke with Williams about his anti-government beliefs and the fact that he did not believe that the police had authority. He did not provide the officer with any identification. Thus, defendant's own conduct contributed to the length of the detention. See Shareef, 100 F.3d at 1501 (when a defendant's own conduct contributes to a dely, he may not complain that the resulting delay is unreasonable). The Court finds that the length of the detention did not exceed the scope of the investigative detention or otherwise transform the investigative detention into a full arrest.

## VI.

In summary, the Court finds that Williams lawfully detained defendant as part of his community caretaking function, regardless of whether he suspected criminal activity. In the alternative, the Court finds that Williams conducted a lawful investigative detention based on reasonable suspicion that criminal activity was afoot. Williams also lawfully conducted a protective frisk of defendant based on a reasonable belief that defendant might be armed. Finally, the Court finds that the length of the detention was reasonable.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Dkt. # 48) is hereby **denied**.

**DATED** this 8th day of August, 2007.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT